**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA
OMAHA DIVISION**

| | |
|---|---|
| JOSE A. GOMEZ, et al.,   ) | |
| ) | |
| Plaintiffs,   ) | |
| ) | |
| v.   ) | CASE NO. 8:08-cv-00021-JFB-TDT |
| ) | |
| TYSON FOODS, INC.,   ) | |
| ) | |
| Defendant.   ) | |
| ) | |

**DEFENDANT'S BRIEF IN OPPOSITION TO
PLAINTIFFS' MOTION FOR RULE 23 CLASS CERTIFICATION**

Michael J. Mueller (*pro hac vice*)
Evangeline C. Paschal (*pro hac vice*)
HUNTON & WILLIAMS LLP
1900 K. Street, N.W.
Washington, DC 20006
Telephone: (202) 955-1500
Facsimile: (202) 778-2201

Steven D. Davidson (NE# 18684)
Allison D. Balus (NE# 23270)
BAIRD HOLM LLP
1500 Woodmen Tower
Omaha, NE 68102-2068
Telephone: (402) 344-0500
Facsimile: (402) 344-0588

Dated: September 20, 2010          ATTORNEYS FOR DEFENDANT,
TYSON FOODS, INC.

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................... 1

II.     STATEMENT OF FACTS ...................................................................................... 3

        A.     Overview of Production Areas.................................................................... 3

        B.     How Employees Are Compensated ............................................................ 4

        C.     Wide Variety of Required And Optional Clothing And Equipment..................... 6

        D.     Breaks and Meal Periods ......................................................................... 12

        E.     Named Plaintiffs And Opt-Ins ................................................................. 13

        F.     Discovery Conducted To Date.................................................................. 14

III.    ARGUMENT ........................................................................................................ 14

        A.     Plaintiffs Have Not Met Their Burden of Demonstrating That The
               Proposed Class Meets the Requirements of Rule 23 ........................................ 14

        B.     Class Treatment Is Not Appropriate Where Plaintiffs Have Failed
               To Identify A Common, Unlawful Policy Of Defendant Applicable
               To All Putative Class Members ................................................................ 15

        C.     Plaintiffs Cannot Meet Their Burden Of Demonstrating That Class
               Treatment Is Appropriate, As Their Motion Is Not Factually
               Supported ................................................................................................. 19

               1.     Plaintiffs Bear The Burden Of Proof Under Rule 23 And
                      Must Satisfy This Burden With Competent Evidence ........................... 19

               2.     Plaintiffs Have Failed To Carry Their Evidentiary Burden
                      Of Demonstrating That Class Action Certification Is
                      Appropriate, As Their Motion Is Not Supported By
                      Adequate Competent Evidence ................................................. 22

                      (a)    Plaintiffs' Unsupported Allegations ........................... 22

                      (b)    Plaintiffs Offer No Evidence of Critical Facts.......................... 23

               3.     Plaintiffs' Reliance On Certain Prior Decisions, In Absence
                      of Any Supporting Evidence, Is Both Factually And
                      Legally Unsupported.................................................................. 24

i

D.   Plaintiffs Are Not Adequate Representatives Of The Requested Class As Required By Rule 23(a) ........................................................ 26

E.   Plaintiffs Do Not Meet The Requirements Of Commonality And Typicality Under Rule 23(a) .................................................... 27

F.   Plaintiff's Proposed Class Does Not Satisfy The Requirements Of Rule 23(b) ........................................................................... 30

     1.   Plaintiffs' Proposed Class Does Not Satisfy The Requirements Of Rule 23(b)(1) ............................................... 30

     2.   Plaintiffs' Proposed Class Does Not Satisfy The Requirements Of Rule 23(b)(3) ............................................... 33

IV.   CONCLUSION.................................................................................... 37

## I.     __INTRODUCTION__

Plaintiffs' motion for Rule 23 class certification (docket nos. 62-63) ("Class Motion") depends on the premise that paying hourly production workers "gang time" plus four additional minutes is a common, unifying policy that makes Plaintiffs' state law claim suitable for class treatment.  This is a false premise.  To prove their claims under Nebraska state law, Plaintiffs must demonstrate not only that the pre- and post-shift and meal period activities at issue are compensable, but also that Defendant's various pay practices during the class period have not fully compensated hourly production employees for such activities.  Plaintiffs cannot prove this on a class wide basis because (i) Defendant's pay practices are *not* uniform (either at any one time, or over time) and (ii) the activities at issue, and the corresponding times, vary from employee to employee.  For example, in addition to gang time plus an additional four minutes of "clothes-changing" time, production employees are on occasion paid additional minutes known as "guaranteed hours" under their collective bargaining agreement.  In addition, employees working in the Slaughter production area frequently receive "sunshine" pay (a type of incentive pay unrelated to actual working time) that far exceeds their production time and clothes-changing, although the amount of additional pay varies and the frequency varies significantly between the two shifts.  Thus, the amount of time paid beyond gang time differs by production area, shift, and day.

Furthermore, determining whether a particular production employee was paid for compensable non-production activities depends on which clothes-changing and related activities the individual performs.  Because production employees wear different combinations of sanitary and protective clothing items, some or all of which may be determined not to be compensable, this question also requires individual inquiry.  Thus, to determine liability the trier of fact must consider for each employee (i) the clothing items worn; (ii) the production area in which the

employee worked; (iii) the shift; and (iv) the amount of extra time paid on a particular day.  Such individualized inquiries are inherently incompatible with class treatment.

Further, Plaintiffs are inadequate representatives of the putative class because their claims and interests are not representative of a significant portion of the putative class.  Namely, *none* of Plaintiffs has ever worked in the Slaughter area of the Dakota City facility, which is where a significant portion of the putative class works.  In fact, several Plaintiffs have testified to having no knowledge about the clothing and equipment and activities of the hourly employees in the Slaughter area.

In addition, a Rule 23 class action is not the superior mechanism for adjudicating Plaintiffs' state law claims in this case.  Plaintiffs purposefully seek to end-run Congress's intent for wage and hour claims in federal court to be "opt-in actions" by deliberately choosing not to pursue certification under the FLSA, despite pleading such claims in their Complaint.[1]  Plaintiffs seek to force potentially thousands of individuals—who have not affirmatively chosen to litigate and may have differing interests from their own—into this case through their state law claims contravening Congressional intent favoring FLSA collective actions.

Finally, Plaintiffs provide minimal evidence to satisfy the "rigorous analysis" that the Court must engage in before allowing class treatment.  Instead, they base their argument almost entirely on unsupported allegations that Defendant has a uniform policy that fails to pay employees for the activities at issue, relying on cases that certified classes under different factual circumstances involving Defendant and other employers in the same industry.  Considering the minimal evidence put forth by Plaintiffs and the substantial evidence submitted by Defendant,

---

[1] Plaintiffs' motion for conditional collective certification under the FLSA was due on December 15, 2008.  On March 18, 2009, the Court informed Plaintiffs' counsel that they needed to file a motion for leave in order to file a conditional certification motion.  Plaintiffs, however, have not filed such a motion.

Plaintiffs have not satisfied their burden for certifying a Rule 23 state law class.  Accordingly, Defendant respectfully requests that Plaintiffs' Motion be denied.

## II.   STATEMENT OF FACTS

1.      Defendant's Dakota City, Nebraska, facility is a beef processing plant that receives, slaughters, and processes cattle into various cuts of beef that are then packaged and shipped either to various Tyson facilities or directly to customers.  Dunlop ¶ 2.[2]

2.      The facility comprises 174 different departments employing workers in 746 discrete job codes.  *Id*. ¶ 3.  The facility employs approximately 3,400 hourly production employees on two shifts in the Slaughter and Processing areas.  Dunlop Dep. 19:21-20:10; Schroeder Dep. 7:20-7:23.  The Slaughter area has approximately 600 hourly employees and the Processing area employs approximately 2,450 hourly employees.  Dunlop Dep. at 20:11-22.

### A.   Overview of Production Areas

3.      In the Slaughter area, live cattle are brought into the plant, killed instantaneously, and hung in shackles.  *Id*. at 17:23-19:20.  As the carcasses travel down a mechanized chain, employees carve the carcasses in a multi-step process.  *Id*.  The carcasses are then sent to a cooler area where they are stored until being moved into the Processing area.  *Id*.

4.      In the Processing area, carcasses from the Slaughter area are cut into various sections.  *Id*.  The sections are then further trimmed by individual lines into various cuts, such as chuck, loin and rounds.  *Id*.  A Processing supervisor may be responsible for one or more departments, depending on the functions of a particular department in Processing.  Dunlop ¶ 3.

---

[2] Declaration and deposition ("Dep.") excerpts and unpublished cases referenced herein are filed separately, in an Index of Evidence in Support of Defendant's Brief in Opposition to Plaintiffs' Motion for Rule 23 Class Certification.

**B.      How Employees Are Compensated**

5.      Hourly production employees are compensated through a variety of payment methods.   Many hourly production employees in the Slaughter and Processing areas are compensated through "gang time."    Schroeder Dep. 7:10-15, 8:11.    However, certain departments in these production areas, comprising approximately 300 hourly employees, are not paid by gang time, including Carcass Receiving, Carcass Unload, Rendering, and Material Handling.   Schroeder Dep. 7:20-8:16.   Gang time ensures that each employee is paid for the length of production, which is the time it takes for all carcasses to travel on mechanized belts through the department.  Arreola ¶ 5; Shumansky¶ 6; Touch ¶ 6.  This means that in such cases, employees are paid production time, that is, from the time the first piece of product passes their work station until the last piece passes their work station. *Id*.; Dunlop Dep. 22:7-10.  Because of differences in production, the amount of gang time credited per day can be different for each area of the production facility.  Arreola ¶ 6; Schroeder Dep. 5:10-18.  Gang time can also vary within a particular production line for a number of reasons, including the number of cattle being slaughtered and line breakdowns.   Arreola ¶ 6; Jessip ¶ 5.   For example, when a line is temporarily interrupted after the last piece of meat has passed, employees stationed towards the end of the line work longer hours and consequently are paid for additional time.  *Id*.  Moreover, as explained below, employees are also paid for additional time beyond the production or "gang time."  Arreola ¶ 7; Jessip ¶ 5 .

6.      In July 1998, the Dakota City facility implemented the "K-Code" in order to compensate hourly production employees for functions performed at the beginning and end of shifts, including the donning and doffing and cleaning of certain items of personal protective equipment ("PPE").  Dunlop Dep. 52:22-54:10.  The "K-Code" is a four-minute pay period that is added on to the seven hours and fifty-six minutes per shift (including a 15 minute paid break)

for which each hourly production employee is compensated.  *Id*. at 11:3-21.  All employees in the Slaughter and Processing areas receive the additional four minutes in "K-Code" compensation.  Schroeder Dep. 15:11-18.

7.      Even within those departments in the Slaughter and Processing areas that use gang time, some employees are paid only partially by gang time because they either arrive early or stay late on the production floor in order to perform set up or clean up.  Anguiano ¶ 5; Arreola ¶ 8; Arnburg ¶ 6; Dunlop, IV ¶ 6; Faber ¶ 4; Hulit ¶ 6; Jessip ¶ 7; Jigre ¶ 5; Koivisto ¶ 4; Martinez ¶ 5; Morales ¶ 7; Prak ¶ 5; Rann ¶ 5; Roum ¶ 6; Sayasone ¶ 6; Swanson ¶ 5.  In such cases, the employees may perform some or all of their pre-shift clothes changing and sanitizing during paid time.  *Id*.  Some employees are paid based on a combination of gang time and the time that their supervisor records the employee starting set up or finishing clean up.  Arreola ¶ 8; Faber ¶ 4; Martinez ¶ 4; Reyes Dep. 103:24-104:5.  The employees who perform the set-up and clean-up duties and receive the additional compensation may also vary on a daily and departmental basis, as supervisors often assign these duties based on seniority or to employees who volunteer.  Arnburg ¶ 6; Dunlop, IV ¶ 6.  Further, employees who complete a project on an individual basis receive compensation beyond gang time.  Jessip ¶¶ 5, 8; Uehling ¶¶ 6-7.  For example, employees work sometimes beyond gang time in order to perform "re-work," meaning they are paid for this additional time spent performing re-work.  Uehling ¶ 7.

8.      Under the collective bargaining agreement applicable at the Dakota City plant, employees also receive "guaranteed" hours, meaning that if the weekly hours worked were less than a certain number of guaranteed hours, employees will be paid the difference between the weekly hours worked and the guaranteed hours.  Dunlop Dep. 60:6-61:16, 62:23-63:6.

9.    Further, employees in the Slaughter production area are paid "sunshine time" in addition to gang time and K code time.  Schroeder Dep. 12:18-15:18; Arreola ¶ 7, 33; Jessip ¶ 46.  "Sunshine time" is the difference between the scheduled shift and the actual amount of production time worked.  Arreola ¶ 7; Schroeder Dep. 12:18-13:10.  Employees in the Slaughter area receive "sunshine time" when they have slaughtered the daily target number of cattle, meaning they are paid for the entire shift even though they did not actually work the entire shift.  *Id*.  For example, if Slaughter is scheduled to run the line for 7 hours and 56 minutes, but it finishes slaughtering the target number of cattle in 7 hours and 50 minutes, the employees are paid for the entire 7 hours and 56 minutes, including the 6 minutes of "sunshine time."  Arreola ¶ 7.  The K code time is then added to the sum of the gang time and sunshine time.  Schroeder Dep. 15:1-18; Arreola ¶¶ 7-8, 33.  The A shift in Slaughter achieves "sunshine time" approximately 98 percent of the time and the B shift achieves it somewhere between 50 to 60 percent of the time.  Schroeder Dep. at 16:23-17:6.  During a shift, hourly employees in Slaughter could receive anywhere from one to twenty-four minutes of "sunshine time," depending on how quickly production work is completed in comparison to the scheduled shift.  *Id*. at 17:2-10.

### C.    Wide Variety of Required And Optional Clothing And Equipment

10.    Plaintiffs claim they are not paid for all of the time spent on donning- and doffing-related activities.  However, depending on their position and personal preference, hourly production employees wear a variety of required and optional items, meaning the amount of time spent on these activities varies by individual employee.  Arreola ¶ 9; Arnburg ¶ 7; Dunlop, IV ¶ 7; Faber ¶ 5; Green ¶ 7; Hulit ¶ 17; Jackson ¶ 7; Jessip ¶ 10; Jigre ¶¶ 7, 20; Kennedy ¶ 7; Koivisto ¶ 6; Martinez ¶ 7; Morales ¶ 8; Prak ¶ 7; Rann ¶ 6; Roum ¶ 7; Sayasone ¶ 7; Shumansky ¶ 10; Swanson ¶¶ 8, 22; Touch ¶ 7; Uehling ¶ 8; Woodside ¶ 7; Braun Dep. 14:9-16;

6

Gomez Dep. 114:4-17; McDonald Dep. 77:16-78:13. Supervisors also have discretion to require employees to wear additional protective items. Anguiano ¶ 43; Arnburg ¶ 15; Arreola ¶ 32; Deaton ¶ 18; Dunlop, IV ¶ 7; Faber ¶ 22; Green ¶ 18; Hulit ¶ 17; Jackson ¶ 19; Jessip ¶ 44; Jigre ¶ 18; Kennedy ¶ 19; Martinez ¶ 38; Morales ¶ 20; Prak ¶ 20; Rann ¶ 14; Roum ¶ 17; Sayasone ¶ 16; Swanson ¶ 21; Touch ¶ 14; Uehling ¶ 17; Woodside ¶ 20.

11.    Most employees are required to wear a hardhat, hairnet, earplugs, and beard net (if applicable) when on the production floor. Arreola ¶ 9; Arnburg ¶ 7; Dunlop, IV ¶ 7; Faber ¶ 5; Green ¶ 7; Hulit ¶ 7; Jackson ¶ 7; Jessip ¶ 10; Jigre ¶ 7; Kennedy ¶ 7; Koivisto ¶ 6; Martinez ¶ 7; Morales ¶ 8; Prak ¶ 7; Rann ¶ 6; Roum ¶ 7; Sayasone ¶ 7; Shumansky ¶ 10; Swanson ¶ 8; Touch ¶ 7; Uehling ¶ 8; Woodside ¶ 7; Braun Dep. 14:3-8; Gomez Dep. 31:5-17; McDonald Dep. 88:13-89:3. Employees in the Slaughter area are required to wear a white shirt and pants ("whites") while working on the production line. Anguiano ¶ 6; Arreola ¶ 9; Choyce ¶ 7; Faber ¶ 5; Jessip ¶ 10; Koivisto ¶ 6; Martinez ¶ 7. However, instead of wearing the whites worn in Slaughter, employees in the Processing area are required to wear a white frock while on the production floor. Arnburg ¶ 7; Deaton ¶ 7; Dunlop, IV ¶ 7; Green ¶ 7; Hulit ¶ 7; Jackson ¶ 7; Jigre ¶ 7; Kennedy ¶ 7; Morales ¶ 8; Prak ¶ 7; Rann ¶ 6; Roum ¶ 7; Shumansky ¶ 10; Touch ¶ 7; Uehling ¶ 8; Woodside ¶ 7. Some employees choose to launder their frocks and whites at home. Braun Dep. 20:18-21:6.

12.    Some employees are not required to wear, and choose to not wear, any clothing or equipment other than their hardhat, hairnet, earplugs, beard net (if applicable), and whites or frock on the production floor. Anguiano ¶ 6, 30; Dunlop, IV ¶ 7; Faber ¶ 13, Braun Dep. 9:11-10:4. However, because they need such equipment due to the work performed in a particular department or position, other employees are required to wear pieces of equipment in addition to

the items worn by all employees.  Anguiano ¶¶ 7-29, 31-35; Arreola ¶¶ 11, 15, 18, 22; Choyce ¶¶ 9-13; Green ¶ 11; Jessip ¶ 11-35.  Moreover, employees may choose to don and doff additional personal clothing at the plant such as handkerchiefs and extra sweaters.  Reyes Dep. 52:10-53:19, 96:2-15.

13.     There is not a facility-wide shoe requirement at Dakota City, other than shoes must have a good tread and not be made of canvas and some employees in Slaughter are required to wear steel-toed boots.  Arnburg ¶ 7; Deaton ¶ 8; Dunlop, IV ¶ 8; Jigre ¶ 6; Kennedy ¶ 6; Swanson ¶ 7; Braun Dep. 7:13-18; Gomez Dep. 32:13-33:4.  Some employees wear their personal shoes, and others wear boots provided by Defendant.  Gomez Dep. 32:19-25.  Employees may wear their shoes and boots into and out of the plant.  Jigre ¶ 6; Kennedy ¶ 6; Prak ¶ 6; Swanson ¶ 7; Woodside ¶ 6; M. Cruz Dep. 59:3-60:10.

14.     Some but not all employees are required to wear safety glasses.  Arreola ¶¶ 14-17, 20-24; Arnburg ¶ 9; Anguiano ¶¶ 15, 20, 22-26, 28, 32-33, 35; Choyce ¶¶ 10, 14, 17, 21, 23, 25, 27, 29; Deaton ¶ 9; Dunlop, IV ¶ 9; Faber ¶ 10; Jessip ¶¶ 12, 15, 18, 29; Koivisto ¶ 8, 12-16, 19, 24-25; Martinez ¶¶ 14-15, 18, 20, 25-26; Morales ¶ 11; Roum ¶ 9; Shumansky ¶ 13; Braun Dep. 7:23-8:5; J. Cruz Dep. 134:21-135:1; Gomez Dep. 32:9-12.

15.     Depending on their position, some employees are required to wear cotton gloves, rubber gloves, rubber aprons, plastic sleeves, or combinations of these items, but these items are optional for most positions and some employees choose to wear them to keep warm and/or dry.  Arreola ¶¶ 11-24; Anguiano ¶¶ 11-35; Dunlop, IV ¶ 9; Woodside ¶¶ 9,13-15,16-19, 21-23, 26-28, 32; J. Cruz Dep. 25:7-17; Gomez Dep. 56:25-57:5; McDonald Dep. 15:3-14; Reyes Dep. 45:19-21.  Some employees also have the option of wearing plastic aprons, rain suits, rain coats or rain pants.  Martinez ¶¶ 28-29; Shumansky ¶ 11; Braun Dep. 10:8-12; Gomez Dep. 49:3-24.

Certain positions require employees to wear various specialized pieces of equipment such as mesh leggings, safety harness, hockey mask, bulletproof vest, tail clipper, or belly guard. Anguiano ¶¶ 10, 16-18, 23-27; Arreola ¶¶ 11, 15, 18, 22; Choyce ¶¶ 14; Green ¶ 12; Jessip ¶ 14; J. Cruz Dep. 20:5-21.

16.     In addition to the equipment that all hourly production employees must wear, knife users are also required to wear at least a protective glove, typically made of mesh or Kevlar, or an arm guard on their non-knife hand.  Anguiano ¶¶ 7-14; Arreola ¶¶ 10-13; Jessip ¶¶ 11-20; Kennedy ¶ 8; Prak ¶ 8; Roum ¶ 10; Sayasone ¶ 9; Shumansky ¶¶ 12-14; Swanson ¶¶ 9. Some employees have options as what to wear on their non-knife hand, including a polar glove or mesh glove with a cuff.  Green ¶ 13; Shumansky ¶ 12; Woodside ¶ 11; Gomez Dep. 38:25-39:13.  Some employees choose to also wear a cotton glove under their mesh glove on their non-knife hand for their own comfort.  Gomez Dep. 38:6-14.  Beyond the required protective glove or arm guard on the non-knife hand, the type of required protective clothing and equipment varies greatly depending on the knife users' department and position, and may include wearing a mesh or Kevlar glove or arm guard on their knife hand, Kevlar Sleeves on one or both arms, a mesh apron, mesh leggings or combinations of these items.  Anguiano ¶¶ 9-14; Arreola ¶¶ 11-13; Jessip ¶¶ 10-19; Kennedy ¶ 8; Prak ¶ 8; Roum ¶ 10; Sayasone ¶¶ 9-10; Shumansky ¶¶ 12-16; Swanson ¶¶ 9-10; Braun Dep. 41:21-23.  However, some knife users choose not to wear any equipment on their knife hand.  Braun Dep. 15:6-12.

17.     In some departments, newly hired employees or employees "on probation" in knife-using positions must wear additional protective equipment.  Hulit ¶ 9; Jigre ¶ 8; Prak ¶8. For example, new hires in Department 755 (Tender Trimmers) must also wear a Kevlar glove on their knife hand "until they qualify for that position," and have the option of continuing to do so

after they have qualified.  Prak ¶ 8.  In Department 753 (Pull Tender), employees who are "on probation" must wear a Kevlar glove and an additional cotton glove on their knife hand and a mesh apron.  Hulit ¶ 9.

18.     Most knife users are also required to carry to and from the production floor their scabbard and steels, and some but not all are also required to carry a hook.  Anguiano ¶ 7; Jessip ¶ 9; Koivisto ¶ 7; Martinez ¶ 8; Braun Dep. 28:22-29:22; Gomez Dep. 35:11-6,41:11-20; Morales ¶ 14; Roum ¶ 11; Uehling ¶ 12.  However, Whizzard Operators' knives are set out for them when they arrive at their station and another employee will put the knives in the Whizzard. Deaton ¶ 12.

19.     Most employees in the Processing area keep their knives in their locker between shifts.  Braun Dep. 47:4-12  However, employees in the Slaughter area put their knives in the knife room before they leave the production floor to be sharpened and sanitized before the next shift.  *Id*. at 47:12-16.  Therefore, unlike the employees in Processing, the Slaughter employees do not sharpen their knives prior to the beginning of the shift.  *Id*. at 48:10-14, 49:8-21.

20.     Some knife users use steels to straighten their knives at the start of or during their shift.  Choyce ¶ 34; Faber ¶ 16; Swanson ¶ 20.  Other knife users are given five minutes three times during each shift to stretch, work their steel, and prepare their knife.  Prak ¶ 19; Swanson ¶ 20.

21.     All hourly employees are assigned a locker in the main locker rooms.  Dunlop ¶ 7. Employees store their required and optional clothing items and equipment at the plant between shifts.  Choyce ¶ 38; Faber ¶ 21.  However, some employees choose to wear some of their work clothes home.  J. Cruz Dep. 136:20-25; Gomez Dep. 57:14-19; Ortiz 37:10-20, 53:2-5.  At the end of each shift, employees place their rubber and fabric clothing items in an assigned laundry

bag, which they throw into a tub in the locker room.  Morales ¶ 16; Braun Dep. 23:9-23.  The laundry room washes or replaces these items that employees have not taken home and returns the laundry to the employees' lockers between shifts.  Arnburg ¶ 12; Arreola ¶ 25; Morales ¶ 16; Gomez Dep. 79:7-16.

22.    Many employees put on or remove some or all of their required items while walking to or from the production floor.  Gomez Dep. 74:10-25, 107:1-12; Reyes Dep. 69:19-70:1.

23.    Employees are not required to wash any of their clothing or other equipment before beginning production work.  Choyce ¶ 33; Faber ¶ 14; Jackson ¶ 13; Jessip ¶ 37; Jigre ¶ 12; Kennedy ¶ 13; Koivisto ¶ 13; Prak ¶ 13; Shumansky ¶ 21; Swanson ¶ 13; Woodside ¶ 14; Gomez Dep. 111:14-20.  However, before beginning production work, some employees must dip some of their clothing and equipment—such as mesh and rubber gloves, hooks, knives, scabbards and steels—in a sanitizing solution.  Anguiano ¶ 37; Choyce ¶ 33; Faber ¶ 14; Jackson ¶ 13; Jessip ¶ 37; Jigre ¶ 12; Kennedy ¶ 13; Koivisto ¶ 13; Martinez ¶ 31; Prak ¶ 13; Shumansky ¶ 21; Swanson ¶ 13; Woodside ¶ 14; Gomez Dep. 111:14-22; Reyes Dep. 69:19-70:11.  Dipping such equipment takes only seconds and can usually be done as employees walk to the production floor.  Choyce ¶ 33; Faber ¶ 14; Jackson ¶ 13 Jessip ¶ 37; Jigre ¶ 12; Kennedy ¶ 13; Koivisto ¶ 13; Martinez ¶ 31; Prak ¶ 13; Shumansky ¶ 21; Swanson ¶ 13; Woodside ¶ 14; Reyes Dep. 70:8-10.

24.    At the end of the shift, some, but not all, employees must rinse certain clothing and equipment, including their knives and related equipment, and non-fabric hand and arm protection, at wash sinks or with spray hoses in the production area.  Anguiano ¶ 42; Dunlop, IV ¶ 12; Choyce ¶ 36; Hulit ¶ 12; Jackson ¶ 17; Kennedy ¶ 17; Shumansky ¶ 26; Uehling ¶ 13.

11

Some employees regularly start to wash their clothing and equipment while the production line is running.  Arreola ¶ 31; Jessip ¶ 41; Koivisto ¶ 35; Martinez ¶ 36; McDonald Dep. 54:23-55:18. Some employees wash their clothing or equipment at their work station, while others go to the wash station.  Anguiano ¶ 42; Faber ¶ 20; Jessip ¶ 42; Jigre ¶ 12; McDonald Dep. 54:23-56:18. The time that it takes employees to wash their equipment varies, depending on their position, the type of equipment they use and their own meticulousness.  Green ¶ 14; Morales¶ 15; Rann ¶ 9; Uehling ¶ 13; J. Cruz Dep. 77:16-78:4; McDonald Dep. 78:1-13.  For example, some but not all employees wash their mesh aprons and some employees have more knives to clean than others do.  Dunlop, IV ¶ 12; Hulit ¶ 12; Jackson ¶ 17; Jigre ¶ 16; Kennedy ¶ 17; Morales ¶ 15; Uehling ¶ 13; Woodside ¶ 18.  In addition, some employees are required to dip some of their clothing or equipment into the sanitizer at the end of the shift.  Dunlop, IV ¶ 12; Woodside ¶ 18.

25.     In short, the amount of time a specific employee spends on (and claims compensation for) donning- and doffing-related activities on a given day varies depending on what equipment he or she was wearing for a particular position, his or her experience in that position, and his or her personal preference regarding equipment and clothing.  McDonald Dep. 77:16-78:4.

**D.      Breaks and Meal Periods**

26.     Hourly production employees receive one 15-minute paid break and one 30-minute unpaid meal period per shift.  Anguiano ¶ 40; Arreola ¶ 29; Deaton ¶ 15; Faber ¶ 18; Green ¶ 16; Hulit ¶ 15; Jessip ¶ 40; Jigre ¶ 13; Dunlop Dep. 8:3-8:20.

27.     Employees do not have to perform any washing or sanitizing prior to or during their break or meal period.  Anguiano ¶ 41 Arnburg ¶ 13; Arreola ¶ 30; Choyce ¶ 36; Jackson¶ 16; Prak ¶ 16; Touch ¶ 13; Uehling ¶ 16; Shumansky ¶ 25; Woodside ¶ 17; Gomez Dep. 111:4-13; Reyes Dep. 86:8-11, 87:4-6.  However, some employees choose to dip their knives and mesh

gloves into sterilizers before breaks.  J. Cruz Dep. 65:1-6.  In addition, some employees must dip their gloves at the dip tank when they return from their break or meal period.  Kennedy ¶ 16.

28.     Employees do not have to remove their hardhat, earplugs, frock and hairnet during breaks or meal time.  Deaton ¶ 16; Swanson ¶ 14; Touch ¶ 13; Woodside ¶ 16.  Some employees do not remove any equipment or clothing.  Anguiano ¶ 41.  However, employees must leave their knives at their work station, and some employees must remove their steel, apron, Kevlar gloves and any mesh.   Arnburg ¶ 14; Arreola ¶ 30; Deaton ¶ 16; Koivisto ¶ 34; Shumansky ¶ 24.  Moreover, some employees choose to remove clothing that Defendant does not require them to remove (*i.e.*, hardhat, earplugs, frock and hairnet).  J. Cruz Dep. 102:3-103:8.  Those employees who remove clothing or equipment often hang their items on hooks near their work station on the production floor.   Jigre ¶ 14; Rann ¶ 13; Woodside ¶ 16; Gomez Dep. 100:14-102:9.  During the break and meal period, employees are permitted to leave the plant or smoke cigarette in a smoking area located immediately outside the plant.   Dunlop ¶ 9.  Employees are not required to leave the production floor during breaks and meal period and some choose to stay on the floor during breaks.  J. Cruz Dep. 61:13-20.

### E.     Named Plaintiffs And Opt-Ins

29.     Six named Plaintiffs brought this action against Defendant.  All of the named Plaintiffs worked in the Processing area, but none of them has ever worked in the Slaughter area.  J. Cruz Dep. 13:22-15:12; M. Cruz Dep. 110:3-5; Gomez Dep. 27:21-23; McDonald Dep. 98:22-24; Ortiz Dep. 10:11-24; Reyes Dep. 43:11-16.  Plaintiff Ted McDonald testified that he "had no idea" what equipment the employees in Slaughter wear or what the employees in Slaughter do before or after their shifts or during their breaks.  McDonald Dep. 98:25-99:5.  Plaintiffs Jose Gomez and Juliana Reyes testified that they do not have any knowledge about the Slaughter area.  Gomez Dep. 27:18-23; Reyes Dep. 43:14-16.  Plaintiff Mario Cruz testified that he does not see

what the employees in Slaughter wear or do.  M. Cruz Dep. 110:3-8.  Plaintiff Cecilia Ortiz testified that she did not know what equipment the employees in Slaughter were required to wear. Ortiz Dep. 52:7-17.

### F.    Discovery Conducted To Date

30.    Plaintiffs have taken three 30(b)(6) depositions of Defendant's representatives on 16 different topics.  Paschal ¶ 3.  Defendant has produced 132,723 pages of documents to Plaintiffs in response to their requests.  *Id*. at ¶ 2.

## III.   ARGUMENT

### A.    Plaintiffs Have Not Met Their Burden of Demonstrating That The Proposed Class Meets the Requirements of Rule 23

The United States Supreme Court has summarized the four basic requirements of Rule 23(a) as:  (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997).  Once the conditions of Rule 23(a) are satisfied, the party seeking certification must also demonstrate that it falls within at least *one* of the subcategories of Rule 23(b).  *Blades v. Monsanto Co.*, 400 F.3d 562, 568-69 (8th Cir. 2005) (citing *Amchem Prods., Inc.*, 521 U.S. at 614).  Plaintiffs bear the burden under Rule 23 to show "under a strict burden of proof" that all requirements of Rule 23 are met and class treatment is appropriate.  *Trevizo v. Adams*, 455 F.3d 1155, 1161 (10th Cir. 2006) (internal quotations omitted); *see also Marion v. Werner Enters.*, No. 8:08CV466, 2009 U.S. Dist. LEXIS 101706, at *9 (D. Neb. Sept. 9, 2009), *adopted by Marion v. Werner Enters.*, No. 8:08CV466, 2009 U.S. Dist. LEXIS 101687 (D. Neb. Nov. 2, 2009).

Here, Plaintiffs have failed to engage in any meaningful analysis or to offer any evidence in their Class Motion that would assist the Court in conducting the "rigorous analysis" required to certify a purported class under Rule 23.  *Elizabeth M. v. Montenez*, 458 F.3d 779, 784 (8th Cir.

2006) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)).  Accordingly, as demonstrated below, Plaintiffs have not met their burden of proving that their proposed class should be certified, and Plaintiffs' Motion should be denied.

>    **B.**      **Class Treatment Is Not Appropriate Where Plaintiffs Have Failed To Identify A Common, Unlawful Policy Of Defendant Applicable To All Putative Class Members**

Plaintiffs request that the Court certify as a class action their claims under the Nebraska Wage and Hour Act ("NWHA"), NEB. REV. STAT. §§ 48-1201 to 48-1209, and the Nebraska Wage Payment and Collection Act ("NWPCA"), NEB. REV. STAT. §§ 48-1228 to 48-1232, claiming Defendant has violated the statutes because its "compensation system, and other practices and policies" have resulted in its employees not being paid for all time worked.  (*See* Dkt. No. 1 at 6, ¶ 24.)  However, because they fail to identify a common policy or practice of Defendant that violates these state statutes, Plaintiffs cannot meet their burden to show that class action treatment is appropriate.  *See Zapata v. IBP, Inc.*, 167 F.R.D. 147, 160 (D. Kan. 1996) (finding plaintiffs could not satisfy typicality element for class certification where they failed to identify an unlawful company-wide practice or policy); *see also Pacheco v. Boar's Head Provisions Co.*, 671 F. Supp. 2d 957, 960 (W.D. Mich. 2009) (representative action inappropriate where plaintiffs did not provide evidence of a common unlawful decision, policy or plan); *Thompson v. Speedway SuperAmerica LLC*, Civ. No. 08-1107 (PJS/RLE), 2008 U.S. Dist. LEXIS 115050, at *16 (D. Minn. Aug. 21, 2008) (representative action inappropriate where plaintiffs could not show corporate policy resulted in failure to pay for compensable activities), *adopted by Dado v. Speedway SuperAmerica LLC*, No. 08-CV-1107 (PJS/RLE), 2009 U.S. Dist. LEXIS 3816 (D. Minn. Jan. 20, 2009).

Instead, Plaintiffs base their argument on an alleged "uniform policy" that simply does not exist.  Plaintiffs incorrectly argue that Defendant's "gang time" method of calculating

payment is a "uniform system" that "violates Nebraska state law because it fails to fully pay workers for several pre- and post-shift activities such as donning, doffing and cleaning personal protective equipment and related walk-time that occurs before and after accomplishing these activities." (Pltfs' Mem. at 4-5.)  Gang time, however, is a red herring.  As an initial matter, gang time, which calculates payment for time spent on the *production* line, is not, in and of itself, unlawful.  *See Blum v. Schuyler Packing Co.*, 377 F. Supp. 1026, 1028 (D. Neb.), *vacated and remanded on other grounds*, 508 F.2d 881 (8th Cir. 1974) (specifically finding that a gang time method for calculating hours worked is not unlawful *per se*).  Further, it is merely a starting point for how hourly production employees are paid.  Each hourly production employee is paid additional minutes beyond gang time, although the number of minutes depends on the individual employee's job, the shift, and the particular day.  Throughout the limitations period, Defendant has paid hourly production employees four additional minutes per day for certain donning- and doffing-related activities at issue here.  *See* Statement of Facts, *supra* ¶ 5-8.  Some employees are also paid beyond gang time for set up or tear down activities.  Employees sometimes are paid additional "guaranteed hours" for time beyond production time, and Slaughter employees frequently receive a varying amount of "sunshine" paid minutes beyond production time.  As such, Plaintiffs' argument that Defendant has had a uniform policy or practice in place of *not* paying for time spent donning and doffing clothing and equipment and performing related activities is simply incorrect.

To the extent Plaintiffs claim that Defendant has not followed its policy of paying for time spent donning and doffing, washing, and walking to and from the line, or that such payments have not fully compensated employees, these alleged *deviations* from policy will inherently vary from employee to employee and will require individualized proof for purposes of

liability. *See Pacheco*, 671 F. Supp. 2d at 966 ("[B]ecause there is a formal policy to pay employees for donning and doffing activities, any failures to follow that policy will be unique to specific departments and supervisors."); *see also Thompson*, 2008 U.S. Dist. LEXIS 115050, at *18 (where alleged practice of failing to pay overtime was contrary to defendant's stated policy, the "individualized nature" of the plaintiffs' claims made the case "inappropriate for certification").

The district court's decision denying certification of plaintiffs' claims in *Pacheco* proves this point.[3] 671 F. Supp. 2d at 966. Like Tyson Foods, the defendant in *Pacheco* had a policy designed to provide employees with varying amounts of additional paid time for donning and doffing at the beginning of their shift and during their meal period. *Id*. at 962. Some *Pacheco* plaintiffs claimed that the defendant did not adhere to its policy and, thus, did not pay them for donning and doffing. *Id*. The *Pacheco* plaintiffs claimed that this failure to follow the policy provided them with common claims. *Id*. In denying certification, the court noted that the plant employed over 500 production workers and that each of the departments "has different requirements for protective equipment" and that "[s]ome of the protective equipment is required and some is optional." *Id*. at 963. The *Pacheco* court recognized that the plaintiffs "put on different items, at different times, in different places, all depending on their job duties and their own personal practices and preferences." *Id*. at 966. These factual differences led the court to deny certification of the class based on "great disparities in the liability issue alone," combined with the fact that any deviation from the formal policy to pay for donning and doffing activities would be based on the unique circumstances of each individual plaintiff's employment. *Id*.

---

[3] Although *Pacheco* analyzed FLSA collective action certification, the facts are analogous to the present case and the same rationale applies to the determination of whether state statutory claims of unpaid compensation should be allowed to proceed as a representative action.

More recently, in *Lugo v. Farmers Pride Inc.*, Civ. Action No. 07-0749, 2010 U.S. Dist. LEXIS 88139, at *78 (E.D. Pa. Aug. 25, 2010), the court decertified an FLSA collective action challenging pay practices at a chicken-processing facility where plaintiffs had likewise claimed that employees were paid by a "uniform compensation system" of production time plus additional paid minutes that failed to pay employees for time spent performing donning and doffing activities before and after shift and at the meal period.  As in this case, the *Lugo* employees wore a variety of PPE items, which differed by employee, and were paid a variable number of additional minutes beyond production time.  Expressly analogizing to Rule 23 and employing a "specific factual analysis" of the plaintiffs' claims that accords with the Third Circuit's requirements for Rule 23 certification in *In re Hydrogen Peroxide Antitrust Litigation*, 552 F.3d 305 (3d Cir. 2008), the *Lugo* court concluded that differences in PPE worn and amount of time paid beyond production time rendered plaintiffs' claims unsuitable for collective action treatment.  2010 U.S. Dist. LEXIS 88139, at * 29 n.7 & ** 79-80.  Specifically, the court found that the differences in PPE worn and additional compensation paid indicated that there may be some plaintiffs with legitimate claims of undercompensation and others lacking the basis for such claims, meaning that the question of undercompensation could not be answered in a manner common to all plaintiffs.  *Id.* at * 37.  The court contrasted plaintiffs' claims from a case where liability can be proven on a class wide basis, with the only material difference among plaintiffs being the amount of damages owed.  *Id*. at * 36.  Instead, because at least some of the plaintiffs likely were compensated fully for the activities at issue, the claimed "undercompensation" was not the result of a "single decision, policy, or plan," but rather depended on how the defendant's policies and practices impacted individual plaintiffs.  *Id.*

Here, the overwhelming evidence shows that Defendant compensated employees for donning and doffing and related activities based on the clothing and equipment required for their particular job position. To the extent Plaintiffs argue that the method of payment failed to compensate hourly production employees fully for time performing such activities, any such inquiry requires individualized proof. It requires an analysis of what position(s) an employee was in, what equipment he was required to wear, what additional optional equipment he chose to wear, how long it took to don and doff that equipment, and whether the minutes paid matched the time that it reasonably took to perform those activities. Here, as in *Pacheco* and *Lugo*, this individualized inquiry creates irreconcilable disparities on the issue of liability that cannot be resolved on a class-wide basis.

### C. Plaintiffs Cannot Meet Their Burden Of Demonstrating That Class Treatment Is Appropriate, As Their Motion Is Not Factually Supported

#### 1. Plaintiffs Bear The Burden Of Proof Under Rule 23 And Must Satisfy This Burden With Competent Evidence

A motion for Rule 23 class action certification must be supported by appropriate factual evidence. Courts "must conduct a 'rigorous analysis' to ensure that the prerequisites of Rule 23 are satisfied" before certifying a class. *Elizabeth M.*, 458 F.3d at 784 (quoting *Falcon*, 457 U.S. at 161); *Avritt v. Reliastar Life Ins*. Co., No. 09-2843, 2010 U.S. App. LEXIS 16700, at *12 (8th Cir. Aug. 12, 2010); *Marion*, 2009 U.S. Dist. LEXIS 101687, at *3. A trial court has broad discretion to certify a class, "but that discretion must be exercised within the framework of Rule 23." *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996); *see also Weathers v. Peters Realty Corp.*, 499 F.2d 1197, 1200 (6th Cir. 1974) ("There must be an adequate statement of the basic facts to indicate that each requirement of the rule is fulfilled.").

Conclusory allegations will not suffice in place of evidentiary analysis to satisfy each Rule 23 requirement. *See, e.g., Walker v. World Tire Corp.*, 563 F.2d 918, 921 (8th Cir. 1977)

("The propriety of class action status can seldom be determined on the basis of the pleadings alone."); *In re Am. Med. Sys., Inc.*, 75 F.3d at 1083 (stating it is not enough to "simply allege the elements of Rule 23(a) in conclusory terms without submitting any persuasive evidence to show that these factors are met"); *Smith v. Transworld Sys., Inc.*, 953 F.2d 1025, 1033 (6th Cir. 1992) (denying leave to assert class action claim where plaintiff "offered little more than conclusory allegations").

Plaintiffs' argument impermissibly limits the burden of proof required for class certification by stating, "the court may not consider the factual merits or weakness of plaintiffs' underlying claims."  (Pltfs' Mem. at 9.)  As recent case law demonstrates, the trend among the Circuits when determining whether to certify a class is to demand that plaintiffs establish each fact necessary to meet Rule 23's requirements by a preponderance of the evidence.  *See In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 320 (3d Cir. 2008); *Am. Honda Motor Co., v. Allen*, 600 F.3d 813, 817 (7th Cir. 2010) ("a district court must make the necessary factual and legal inquiries and decide all relevant contested issues prior to certification"); *Ala. Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 228 (5th Cir. 2009) (issue of predominance must be established by a preponderance of the evidence); *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F. 3d 196, 202 (2d Cir. 2008) (holding that "the preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements."); *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 366 (4th Cir. 2004) ("the factors spelled out in Rule 23 must be addressed through findings, even if they overlap with issues on the merits.").

Perhaps, the leading case on this issue is *In re Hydrogen Peroxide Antitrust Litigation*, in which the U.S. Court of Appeals for the Third Circuit vacated the district court's decision to grant class certification, holding that the "'threshold showing'" required by the district court that

the underlying claims would predominately involve generalized issues of proof "is an inadequate and improper standard." 552 F.3d at 321 (finding such standard "could signify, incorrectly, that the burden on the party seeking certification is a lenient one … or that the party seeking certification receives deference or a presumption in its favor"). The Third Circuit held that "[f]actual determinations supporting Rule 23 findings must be made by a preponderance of the evidence," upon consideration of all relevant evidence. *Id.* at 307. For example, to satisfy the predominance element of a Rule 23 class action, the Court found that "the task for plaintiffs … is to demonstrate that the element of [the underlying claim] is capable of proof at trial through evidence that is common to the class rather than individual to its members." *Id.* at 311-12; *Mevorah v. Wells Fargo Home Mortgage* (*In re Wells Fargo Home Mortgage Overtime Pay Litig.*), 571 F.3d 953, 957-59 (9th Cir. 2009) (reversing the district court's class certification because, despite the employer's policy of treating all employees as exempt, the court still must make individualized determinations as to whether class members actually perform similar duties).

Moreover, district courts in this Circuit have applied this same standard to deny class certification where the plaintiff did not establish "by a preponderance of the evidence that she [could] make a prima facie showing of each element of the [underlying] claim with common evidence." *Walsh v. Principal Life Ins. Co.*, 266 F.R.D. 232, 240 n.7 (S.D. Iowa 2010); *Mooney v. Allianz Life Ins. Co.*, Civ. No. 06-545 ADM/FLN, 2009 U.S. Dist. LEXIS 15626, at *13 (D. Minn. Feb. 26, 2009) (applying preponderance of evidence standard in determining whether class or individual issues predominate); *see also Gries v. Standard Ready Mix Concrete, L.L.C.*, 252 F.R.D. 479, 482 (N.D. Iowa 2008) ("To determine whether the requirements of Rule 23(a) have been satisfied, the court must examine the factual basis for the plaintiff's claims . . . .").

According to these recent decisions, the Court should take a cautious, restrictive approach in deciding whether to certify a class, considering all of the evidence presented and not presuming Plaintiffs have met the requirements for class treatment, particularly where, as here, individual issues will predominate in the merits inquiry.[4]

> 2.   Plaintiffs Have Failed To Carry Their Evidentiary Burden Of Demonstrating That Class Action Certification Is Appropriate, As Their Motion Is Not Supported By Adequate Competent Evidence

As demonstrated above, the starting point for analyzing whether Plaintiffs have carried their burden is the evidence proffered by Plaintiffs themselves.

> (a)   *Plaintiffs' Unsupported Allegations*

Here, Plaintiffs cannot carry their burden under Rule 23 because they base their Certification Motion almost entirely on *unsupported* and *unverified* allegations in their Complaint.  No record evidence exists to support these conclusory allegations:

- "This [gang time] system fails to pay the production and support workers for all time spent donning, doffing, and cleaning their personal protective equipment, and related activities, before and after shifts on the production line and during unpaid break times."  (Pltfs' Mem. at 3.)

- "'Gang time' uniformly does <u>not</u> record time that production workers spend donning, doffing, and cleaning themselves and their personal protective equipment before and after line time and at unpaid meal breaks."  (Pltfs' Mem. at 3.)

Notably, Defendant denied each of these allegations in its Answer to Plaintiffs' Complaint.  (*See* Def. Answer (Dkt. No. 10), ¶¶ 14-24.)  Thus, there is no merit to Plaintiffs' argument that "[m]ost of the important facts that support class certification are not expected to be contested in this litigation" and that there will be "little, if any, factual dispute" as to whether this case is suitable for class action treatment.  (Pltfs' Mem. at 1-2.)

---

[4] Although Defendant asserts that this Court should require Plaintiffs to establish each fact necessary to meet Rule 23's requirements for class certification by a preponderance of the evidence, even if the Court applies a less rigorous standard, Plaintiffs cannot prevail given the dearth of evidence they have presented.

Further, as explained above, that gang time is used in part as a basis for compensation has no bearing on whether Plaintiffs have established a uniform policy or practice of non-compensation for the activities at issue, as it is but one piece in an employee's total compensation, which includes additional pay each day in an amount that depends on a variety of factors, which themselves may fluctuate from day to day. Thus, Plaintiffs' unsupported statement that Defendant "readily concedes that they have a uniform 'gang-time' system of pay, which pertains to most of the hourly production [workers] at [] Dakota City, Nebraska." (Pltfs' Mem. at 3) is incorrect, and indeed is rebutted by the *record evidence*. *See* Statement of Facts, *supra* ¶ 5-8. Moreover, there are major factual differences in the activities that hourly production employees perform on and off "gang time," as well as in the way that any compensation is calculated, because of differences in personal protective equipment and activities among departments and job positions. *See* Statement of Facts, *supra* ¶¶ 5-25. Thus, not only are most of Plaintiffs' allegations unsupported by any evidence, the factual record directly refutes these allegations.

(b)   *Plaintiffs Offer No Evidence of Critical Facts*

The only competent evidence Plaintiffs have submitted in support of their Class Motion are brief declarations from two union representatives at the Dakota City facility. (*See* Dkt. No. 64, Exhs. A and B.) Plaintiffs attempt to use these declarations to show how Defendant uses the gang time system and how the system compensates employees for their time. (*See* id.)

Indeed, Plaintiffs' Motion reveals weaknesses, mostly for what it does *not* say and the evidence it does *not* present. Despite Plaintiffs' statement that "[t]here are approximately 3,400 hourly employees at Tyson's Dakota City, Nebraska facility" with "potential claims," Plaintiffs have utterly failed to offer *any* evidence to support their argument for class certification from the hourly production employees they seek to represent, including themselves. (Pltfs' Mem. at 2.)

23

Likewise, Plaintiffs offer no evidence of any policy or practice of Defendant that denies payment of donning and doffing-related activities.  They also offer no evidence of any employee's job duties, the amount of time or compensation employees receive for pre- and post-shift and break activities, the types of clothing worn and equipment used by each employee, or time spent walking to and from their work stations.  In short, Plaintiffs offer no evidence about how they are compensated or that the types of clothing they wear are representative of the hundreds, and possibly thousands, of individuals in the putative class they propose to represent, or that the other activities of the putative class members are similar to one another.  In fact, Plaintiffs do not even offer any competent evidence that the alleged state law violations affected them, let alone any other employee.  In the complete absence of evidence of commonalities among the putative plaintiffs or of any violation affecting *any* employee, a class encompassing possibly thousands of current and former employees should not be certified.

3.    Plaintiffs' Reliance On Certain Prior Decisions, In Absence of Any Supporting Evidence, Is Both Factually And Legally Unsupported

Rather than presenting factual evidence to satisfy their burden of proof for class certification, Plaintiffs improperly attempt to rely, almost wholly, on the certification decisions in *Lopez v. Tyson Foods, Inc.*, No. 8:06CV459, 2008 U.S. Dist. LEXIS 60050 (D. Neb. Aug. 7, 2008), *Morales v. Greater Omaha Packing Co.*, 266 F.R.D. 294 (D. Neb. 2010), *Bouaphakeo v. Tyson Foods, Inc.*, 564 F. Supp. 2d 870 (N.D. Iowa 2008), and *Garcia v. Tyson Foods, Inc*., 255 F.R.D. 678 (D. Kan. 2009).  However, Plaintiffs cannot satisfy their burden of proving that certification is appropriate by a preponderance of the evidence simply by citing other class action decisions involving Tyson Foods or defendants in the same industry.[5]  *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 322 ("[A]ctual, not presumed, conformance with the Rule 23

requirements remains necessary" for class certification.) (internal quotations omitted).  Plaintiffs' argument ignores that "the unique facts of each case will generally be the determining factor governing certification."  *Id*.  (quoting *Robinson v. Tex. Auto. Dealers Ass'n*, 387 F.3d 416, 420-21 (5th Cir. 2004)).  Indeed, Defendant's Dakota City facility was not involved in any of those actions, and accordingly, certification in this case must be decided on its own facts.  *See Trevizo*, 455 F.3d at 1163 ("Each case must be decided on its own facts, on the basis of 'practicalities and prudential considerations.'") (quoting *Monreal v. Potter*, 367 F.3d 1224, 1238 (10th Cir. 1999)).

In making their conclusory statement that the *Lopez* court certified a class at another of the Defendant's plant based on claims "identical to claims of Plaintiffs here . . ." (Pltfs' Mem. at 5), Plaintiffs ignore that courts have recently applied a more rigorous analysis in determining whether Plaintiffs have satisfied their burden of proof for class certification.  This more rigorous analysis is much more exacting than the standard applied in *Lopez*, *Morales*, *Bouaphakeo*, and *Garcia*.  Plaintiffs' argument that this Court should certify a class here based upon the rulings in class actions involving Tyson Foods or other defendants in the same industry rests on the incorrect and unsupported assumption that all of Defendant's plants (and indeed, all of the industry's processing plants) function identically with regard to compensation, and more specifically, gang time.  Plaintiffs cannot ask the Court to "presume" that the requirements for class certification under Rule 23 are satisfied merely because other courts granted certification in cases involving Defendant, and therefore this Court should consider the merits of Plaintiffs' Class Motion based upon the evidence, or lack thereof, presented in *this* case.

---

[5] Indeed, Plaintiffs cannot satisfy *any* standard used by courts in determining whether a class action is appropriate by merely citing this unrelated case law.

**D.** **Plaintiffs Are Not Adequate Representatives Of The Requested Class As Required By Rule 23(a)**

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). To satisfy this requirement, Plaintiffs must establish that they have common interests with the class they purport to represent and that they will vigorously prosecute the interests of the class. *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 562-63 (8th Cir. 1982). A class cannot be certified under Rule 23 where plaintiffs "simply allege the elements of Rule 23(a) in conclusory terms without submitting any persuasive evidence to show that these factors are met." *In re Am. Med. Sys., Inc.*, 75 F.3d at 1083; *see also In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 307, 309; *J.B. ex rel. Hart v. Valdez,* 186 F.3d 1280, 1290 n.7 (10th Cir. 1999); *Fleming v. Travenol Labs., Inc.*, 707 F.2d 829, 831 (5th Cir. 1983). Defendant does not dispute the qualifications of Plaintiffs' counsel; however, it does dispute whether the class representatives have common interests with the members of the class and will vigorously prosecute those interests.

Class certification should be denied because the named Plaintiffs, who were deposed, do not adequately represent the interests of a significant portion of the putative class. *See Robinson v. Sheriff of Cook County*, 167 F.3d 1155, 1157 (7th Cir. 1999) (class representative's weak claim is independent reason to doubt adequacy of representation); *O'Neal v. Wackenhut Servs., Inc.*, No. 3:03-cv-397, 2006 U.S. Dist. LEXIS 34634, at *60 (E.D. Tenn. May 25, 2006) (finding named plaintiffs inadequate class representatives, in part, because "the unique circumstances" of their claims made their own claims "significantly weaker than claims of many potential class members"). Namely, despite the fact that approximately 20 percent of the putative class works in the Slaughter area, *none* of the named Plaintiffs has ever worked in that area. (*See* Statement of Facts, *supra* ¶¶ 2, 7.) Further, most of the named Plaintiffs testified that they have no

26

knowledge about the pertinent facts in the Slaughter area, including the clothing and equipment worn by and the work activities of the employees in Slaughter.  (*See* id. ¶ 29.)  This lack of knowledge is particularly troubling, given that Slaughter employees engage in a completely different function, wear different clothing and equipment, and store and maintain their knives differently than employees in Processing, which is the area in which all of the named Plaintiffs work.  (*See* id. ¶¶ 3, 4, 9, 11, 13, 19.)

In short, Plaintiffs are asking this Court to certify a class, in which *none* of the class representatives has similar claims and interests to those of the employees in Slaughter, who account for nearly one-fifth of the putative class.  Such class representatives could not possibly adequately represent the interests of a Rule 23 class.

**E.     Plaintiffs Do Not Meet The Requirements Of Commonality And Typicality Under Rule 23(a)**

In seeking to certify a class under Rule 23, Plaintiffs must prove that there are "questions of law or fact common to the class."  FED. R. CIV. P. 23(a)(2); *see also Amchem*, 521 U.S. at 613.  Similarly, the third subdivision of Rule 23(a) requires that "claims or defenses of the representative parties [be] typical of the claims or defenses of the class."  FED. R. CIV. P. 23(a)(3).  As the U.S. Supreme Court noted:

> The commonality and typicality requirements of Rule 23(a) tend to merge.  Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.

*Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147,157 n.13 (1982); *see also Adams v. Fed. Materials Co.*, No. 5:05-CV-90-R, 2006 U.S. Dist. LEXIS 92539, at *14 (W.D. Ky. Dec. 19, 2006); *Serrano v. Cintas Corp.*, Civ. No. 04-40132, Civ. No. 06-12311, 2009 U.S. Dist. LEXIS 26606, at **24-25 (E.D. Mich. Mar. 31, 2009) ("'Where a class definition encompasses many

individuals who have no claim at all to the relief requested, or where there are defenses unique to the individual claims of the class members, …the typicality premise is lacking, for ─ under those circumstances ─ it cannot be said that a class member who proves his own claim would necessarily prove the claims of other class members.'") (citation omitted).  Typicality cannot be established "when proof of a violation requires individualized inquiry." *Elizabeth M.*, 458 F.3d at 787; *see also Parke v. First Reliance Standard Life Ins. Co.*, 368 F.3d 999, 1004-05 (8th Cir. 2004).

Because Plaintiffs' claims are not common or typical of the class, the proposed class does not meet the commonality or typicality elements.  To state a claim under the NWPCA, Plaintiffs must show that Defendant failed to pay "'compensation for labor or services rendered by an employee, … when previously agreed to and conditions stipulated have been met by the employee.'"  *Pick v. Norfolk Anesthesia, P.C.*, 276 Neb. 511, 516, 755 N.W. 2d 382, 386 (Neb. 2008) (quoting NEB. REV. STAT. § 48-1229(4) (Supp. 2007)).  Plaintiffs claim that "Defendant Tyson acted uniformly as to all of its production workers in deciding not to pay them for all time spent" donning, doffing, and cleaning their personal protective equipment and for walking time associated with those tasks.  (Pltfs' Mem. at 13-14.)  This claim is not only disingenuous, it is absolutely refuted by the evidence.  Indeed, the only evidence of a uniform policy is Tyson's policy *to pay* employees extra minutes for donning and doffing related activities.

In contrast to Plaintiffs' utter lack of evidence, Defendant has submitted substantial evidence, through the testimony of both hourly employees and Defendant's management, of significant differences among each of the potential class members:

- The individuals within the putative class worked in a variety of different departments, during different time periods, and with many different supervisors.

- Employees wear varying combinations of sanitary and protective clothing and equipment depending on their position, department, shift, and personal preference. The employees' different clothing and equipment result in different amounts of time spent putting on, removing, and washing clothing and equipment.

- Employees who use knives in the Slaughter and Processing areas are required to store and maintain their knives in significantly different ways.

- Some employees paid in part by gang time received additional pay under applicable collective bargaining agreements.

- On most days, employees in the Slaughter area are paid for time — ranging from one to twenty-four minutes — that they do not actually work because Slaughter has met its daily production quota and stops production early. The amount of additional time paid depends both on the day and the shift.

- Some employees, particularly those employees who use knives, are required to wash and clean equipment at the end of each shift; but other employees are never required to do this.

- In each department, some employees were paid to arrive early and/or paid to stay late for various reasons, including set up and teardown activities, giving them further opportunity to change clothes and equipment, wash, and walk during this extra paid time.

- Within each department, many different supervisors were responsible for controlling work clothing and equipment, and compensation decisions, including different employee start and end times, different employee clothing and equipment depending on their position, and allowing employees to work after their scheduled shift ended and paying them until they completed their work.

*See* Statement of Facts, *supra* Section II.

Accordingly, the claims of named Plaintiffs, none of whom ever worked in the Slaughter area, cannot possibly be typical or common of the claims of the potential class. Moreover, these factual differences are not merely factors that will affect damages in this case, but they speak to whether Defendant has any liability. Confronted with similar facts, in *Marion*, the federal district court of Nebraska held that the plaintiffs failed to meet their burden—of showing their claims were typical of those of the putative class—because the state law claims, including their NWPCA claim, required individualized factual inquiries into the circumstances surrounding each

employee's claims for unpaid wages and benefits.  2009 U.S. Dist. LEXIS 101687, at *5.  The *Marion* court further held that the plaintiffs failed to show commonality existed because "[t]here [were] factual disputes as to a number of the employees regarding both liability and damages" where the employer's compensation practices had varied over time depending on an employee's assignments and experience level.  *Id*. at **4-5.

Here, as in *Marion*, Plaintiffs cannot meet the typicality and commonality requirements of Rule 23(a) as to their NWPCA claim because each putative class member will have a different amount of claimed time for the activities at issue; and individual questions will arise about whether the various amounts of time and compensation practices applied by Defendant adequately compensated such hourly production employees.  Therefore, Plaintiffs' state law claims fail to meet the commonality and typicality requirements for class treatment under Rule 23.  *In re Teflon Prods. Liab. Litig.*, 254 F.R.D. 354, 364-66 (S.D. Iowa 2008); s*ee also Andrews v. AT&T*, 95 F.3d 1014, 1023 (11th Cir. 1996); *Zimmerman v. Bell*, 800 F.2d 386, 390 (4th Cir. 1986).

     **F.**     **Plaintiff's Proposed Class Does Not Satisfy The Requirements Of Rule 23(b)**

     1.     Plaintiffs' Proposed Class Does Not Satisfy The Requirements Of Rule 23(b)(1)

As discussed above, to prevail on their Motion, Plaintiffs also must satisfy one of the subsections of Rule 23(b).  In order to satisfy 23(b)(1), Plaintiff must demonstrate that:

prosecuting separate actions by or against individual class members would create a risk of:

(A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

(B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability

30

to protect their interests.

Fed. R. Civ. P. 23(b)(1).

In relying on the *Bouaphakeo* decision from the Northern District of Iowa in support of their argument for class certification, Plaintiffs have conveniently ignored the fact that the court there *denied* certification under Rule 23(b)(1). 564 F. Supp. 2d at 907-08. For the same reasons expressed by the court in *Bouaphakeo*, among others, Rule 23(b)(1) is inapplicable to Plaintiffs' proposed state law class.

With respect to Rule 23(b)(1)(A), if the class were not certified in this case, it would create no risk of inconsistent adjudications that establish inconsistent standards of conduct because each claim would be based upon whether that individual had performed compensable activities for which he or she was not paid. Where, as here, individualized facts are the determining factor as to liability, deciding in separate actions whether the defendant is liable to each putative class member for unpaid time would not establish incompatible standards of conduct for Defendant, even if the results of such separate actions may differ. *See Bouaphakeo*, 564 F. Supp. 2d at 907 ("[T]he court does not see how individual lawsuits achieving different results would impair Tyson's ability to pursue a uniform continuing course of conduct."); *Smith v. Brown & Williamson Tobacco Corp.*, 174 F.R.D. 90, 99 (W.D. Mo. 1997) ("Although individual lawsuits might end with different results, this does not justify certification of the class [under Rule 23(b)(1)]."); *Trecker v. Manning Implement, Inc.*, 73 F.R.D. 554, 560 (N.D. Iowa 1976) ("The 'inconsistent or varying adjudications' of Rule 23(b)(1)(A) do not include the simple case where two individuals sue the same defendants for the same relief and one wins while the other loses. The meaning intended is the situation where the two individuals are suing the defendants for different and incompatible relief.") (citation omitted). In finding that the plaintiffs did not meet their burden of proving class certification was appropriate under Rule

31

23(b)(1)(A), the *Bouaphakeo* court held that "Tyson would not be put in a conflicted position simply because Tyson might have 'to pay damages to some class members but not to others or to pay them different amounts.'" *Bouaphakeo*, 564 F. Supp. 2d at 907 (citing WRIGHT, MILLER, & KANE, FEDERAL PRACTICE AND PROCEDURE § 1773 at 13 (2005 & Supp. 2007)).

Additionally, where plaintiffs only or primarily are seeking compensatory damages, and not declaratory or injunctive relief, Rule 23(b)(1)(A) cannot be the basis for certifying a class action. *Babineau v. Fed. Express Corp.*, 576 F.3d 1183, 1195 (11th Cir. 2009) (citing *Cohen v. Office Depot, Inc.*, 204 F.3d 1069, 1078 n.7 (11th Cir. 2000)); *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 421 n. 16 (5th Cir. 1998). In *Babineau*, the court found that although the plaintiffs were seeking both compensatory damages and injunctive relief, the "primary remedy" sought was monetary relief. The plaintiffs only sought limited injunctive relief when they demanded a "'permanent injunction restraining defendant from continuing to require and accept labor from hourly employees without pay.'" 576 F.3d at 1195 (citing *Cohen*, 204 F.3d at 1078 n.7). Here, as in *Babineau*, although Plaintiffs are requesting limited injunctive relief in the form of enjoining "Defendant Tyson from continuing to commit unlawful practices related to wages," the *primary* remedy they are requesting is compensatory damages. (*See* Dkt. No. 1 at Prayer for Relief ¶ B.) Accordingly, class certification under Rule 23(b)(1)(A) should be denied.

Similarly, class certification under Rule 23(b)(1)(B) should be denied because adjudications of the claims of individual class members would not be dispositive of the interests of the claims of other class members. Because analyzing Plaintiffs' state law claims will require adjudicating individualized issues with respect to whether each class member performed activities during unpaid time for which they should have been compensated and whether the amount of time they were individually compensated was sufficient, Rule 23(b)(1)(B) does not

apply.  *See Trecker*, 73 F.R.D. at 560.  *Cf. Brothers v. Tyson Foods, Inc.*, No. 4:06-CV-4676-VEH (N.D. Ala. Jan. 23, 2008) (Order Denying Motion for Declaratory Judgment), slip op. (finding resolution of only one individual employee's donning and doffing claim would not be dispositive of other employees' claims).  Indeed, Rule 23(b)(1) certification "should properly be confined to those causes of action in which there is a total absence of individual issues." *McHan v. Grandbouche*, 99 F.R.D. 260, 266 (D. Kan. 1983).

Further, Plaintiffs' argument that most of the putative plaintiffs "lack the financial resources to litigate alone against a corporate giant like Tyson Foods" actually supports finding that Rule 23(B)(1)(b) class certification is inappropriate.  (Pltfs' Mem. at 17.)  Rule 23(b)(1)(B) "is not really concerned with the financial resources of individual plaintiffs, but rather the financial resources of the defendant" and is meant to be "invoked in 'limited fund' circumstances, whereby individual actions may deplete the limited amount of monetary recompense available and leave some individuals without a remedy." *McHan*, 99 F.R.D. at 266 (denying class certification under 23(b)(1)(B) on basis that case did not involve "limited fund"); *see also Amchem Prods.*, 521 U.S. at 614 ("Rule 23(b)(1)(B) includes … 'limited fund' cases, instances in which numerous persons make claims against a fund insufficient to satisfy all claims.").  Where, as here, the Plaintiffs' claims clearly do not involve a "limited fund," Rule 23(b)(1)(B) should not be the basis for class certification.

   2. <u>Plaintiffs' Proposed Class Does Not Satisfy The Requirements Of Rule 23(b)(3)</u>

To demonstrate that their proposed class is appropriate pursuant to Rule 23(b)(3), Plaintiffs must show "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other

available methods for fairly and efficiently adjudicating of the controversy."  FED. R. CIV. P. 23(b)(3).

The Supreme Court has stated that the predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem Prods.,* 521 U.S. at 594; *see also Blades*, 400 F.3d at 566.  "The nature of the evidence that will suffice to resolve a question determines whether the question is common or individual."  *Id*. at 566. This means that "[i]f, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question. If the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question." *Id*.

Here, Plaintiffs contend that common questions of law and fact predominate because they "are centered around Tyson's uniform course of conduct in refusing to pay its production workers for all work performed before and after their gang time" and "because the same operative facts underlying Defendant Tyson's uniform refusal to pay production workers for all time spent donning, doffing and cleaning their personal protective equipment form the basis of Plaintiffs' claims for violation of Nebraska state law." (Pltfs' Mem. at 18.)  In addition to wrongly contending a uniform system, Plaintiffs fail to identify any common facts that they allege predominate the determination of their state law claims.  Instead, Plaintiffs fail to satisfy their burden of proof for class treatment by basing their entire argument on the *Bouaphakeo* decision, rather than submitting the evidence required to satisfy their burden of proof for class certification based on the facts of *this* case.

Plaintiffs' complete reliance on the Northern District of Iowa's decision in *Bouaphakeo* is particularly misplaced in light of more recent decisions of the U.S. Courts of Appeals, discussed

34

above, reaffirming the strict standard Plaintiffs must satisfy to establish that class treatment is appropriate. These cases focus on the predominance element of Rule 23(b)(3) and deny certification by finding issues, similar to the underlying issues in the present case, may be resolved only by individualized inquiries. *See e.g., In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 311-12.

In short, Plaintiffs have not established by a preponderance of the evidence that they can make a prima facie showing of each element of the underlying claims in this action through common evidence. Under the Nebraska statutes, an element of proving their case is to show that they were not paid all wages due to them; however, Plaintiffs have failed to show that Defendant has any sort of common policy or practice of *not* paying hourly production employees for all wages they were supposedly owed.

For these same reasons, Plaintiffs' argument that a class action is the superior method of adjudicating the potential class members' state law claims is incorrect. Contrary to Plaintiffs' assertion, a class action will not increase manageability of the claims, nor is it the only way to present their claims. (Pltfs' Mem. at 19, 22-23.) Proving liability with respect to each class member will require Plaintiffs to present individualized evidence as to each element of the potential class members' claims, necessitating individual trials of each individual's claim. *See King v. W. Corp.*, No. 8:04CV318, 2006 U.S. Dist. LEXIS 3926, at *47-48 (D. Neb. Jan. 13, 2006) (denying motion to certify class on plaintiffs' FLSA claims where "[t]he exempt or non-exempt status of 177 opt-in plaintiffs would need to be determined on a job-by-job, or an employee-by-employee basis, resulting in essentially individual trials, even if a class were certified"); *see also, e.g., Lugo* , 2010 U.S. Dist. LEXIS 88139, at *78 ("given the variations . . . in the amount of time workers may need to don and doff their PPE, too many individualized

inquiries would be necessary to accurately determine whether defendant undercompensated, and thus is liable to, all plaintiffs in this case"); *Telco Group, Inc. v. Ameritrade, Inc.*, No. 8:05CV387, 2006 U.S. Dist. LEXIS 83475, at *31 (D. Neb. Nov. 6, 2006) ("Having to engage in separate threshold inquiries for each class member prior to reaching the common issues does not promote [judicial] economy….[It] will create judicial dis economy.") (internal citations and quotations omitted).

In addition, recent decisions have held that "the incompatibility between Rule 23 and Section 216 [of the FLSA] precludes a finding of superiority with regard to . . .  state wage claims."  *Ervin v. OS Rest. Servs., Inc.*, No. 08 C 1091, 2009 U.S. Dist. LEXIS 56062, at *7 (N.D. Ill. July 1, 2009); *see also Daprizio v. Harrah's Las Vegas, Inc.*, No. 2:10-CV-00604-GMN-RJJ, 2010 U.S. Dist. LEXIS 84307, at *13-14 (D. Nev. Aug. 17, 2010); *Riddle v. Nat'l Sec. Agency, Inc.*, No. 05 C 5880, 2007 U.S. Dist. LEXIS 68842, at *8-9 (N.D. Ill. Sept. 13, 2007); *Leuthold v. Destination Am., Inc.*, 224 F.R.D. 462, 469-70 (N.D. Cal. 2004); *Hasken v. City of Louisville*, 213 F.R.D. 280, 284 (W.D. Ky. 2003).  In denying Rule 23 class certifications, courts have relied on the conflicting opt-in versus opt-out procedural mechanisms for joining class members, focusing on Congress's intent in creating the opt-in procedure for federal courts to "'limit[] private FLSA plaintiffs to employees who asserted claims in their own right and free[] employers from the burden of representative actions.'"  *Riddle,* 2007 U.S. Dist. LEXIS 68842, at *9-10 (citation omitted); *see also Ervin*, 2009 U.S. Dist. LEXIS 56062, at *4.

Here, Plaintiffs are purposefully seeking to circumvent Congress's intent for wage and hour claims in federal court to be "opt-in actions" by deliberately choosing not to pursue certification under the FLSA, despite pleading such claims in their Complaint.  In stark opposition to Congress' intent, Plaintiffs seek to force potentially thousands of individuals—who

have not affirmatively chosen to litigate and may have differing interests from their own—into this case through their state law claims.  Plaintiffs should not be permitted to create an end run around the FLSA's opt-in requirement by seeking Rule 23 class certification, particularly where they are not adequate representatives of the class and where most of the potential class members have not shown any interest in joining this lawsuit.  *Ervin*, 2009 U.S. Dist. LEXIS 56062, at *6 (citing *Riddle*, 2007 U.S. Dist. LEXIS 68442, at *3).

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Rule 23 Class Certification should be denied.

Respectfully submitted,

*/s/ Michael J. Mueller*
Michael J. Mueller (*pro hac vice*)
Evangeline C. Paschal (*pro hac vice*)
HUNTON & WILLIAMS LLP
1900 K Street, N.W.
Washington, DC 20006
Telephone: (202) 955-1500
Facsimile: (202) 778-2201

*/s/ Allison D. Balus*
Steven D. Davidson (NE# 18684)
Allison D. Balus (NE# 23270)
BAIRD HOLM LLP
1500 Woodmen Tower
Omaha, NE  68102-2068
Telephone: (402) 344-0500
Facsimile: (402) 344-0588

ATTORNEYS FOR DEFENDANT,
TYSON FOODS, INC.

**CERTIFICATE OF SERVICE**

The undersigned certifies that this 20th day of September, 2010, I electronically filed the foregoing Defendant's Brief in Opposition to Plaintiffs' Motion for Rule 23 Class Certification with the Clerk of the Court using the Court's CM/ECF filing system, which will serve notice of electronic filing upon the following:

 Brian P. McCafferty
 cafstar@aol.com

 Michael Hamilton
 mhamilton@provostumphrey.com

        */s/ Michael J. Mueller*
        Michael J. Mueller